UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILLIAM R. CLAYTON, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AIR & LIQUID SYSTEMS CORPORATION, et al.,<br><br>Defendants. | CASE NO. C18-0748JLR<br><br>ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT |

## I. INTRODUCTION

Before the court are two motions: (1) Defendant Syd Carpenter Marine Contractor, Inc.'s ("Syd Carpenter") motion for partial summary judgment (Syd MSJ (Dkt. # 86)); and Plaintiffs William R. Clayton and Jill D. Clayton's (collectively, "Plaintiffs")[1] motion for partial summary judgment (Pls. MSJ (Dkt. # 117)). The parties

---

[1] Mr. Clayton passed away on May 28, 2019. (*See* Mot. to Amend (Dkt. # 103) at 1.) Pending before the court is Ms. Clayton's motion to amend the complaint to re-plead this case as

have filed responses and replies to the motions. (Syd Resp. (Dkt. # 95); Syd Reply (Dkt. # 100); Pls. Resp. (Dkt. # 125); Pls. Reply (Dkt. # 135).) The court has considered the motions, the parties' submissions concerning the motions, the relevant portions of the record, and the applicable law. Being fully advised,[2] the court GRANTS in part and DENIES in part Syd Carpenter's motion for partial summary judgment and GRANTS Plaintiffs' motion for partial summary judgment.

## II. BACKGROUND

### A. Mr. Clayton's Alleged Exposure

Mr. Clayton developed mesothelioma after exposure to asbestos-containing products during his service in the United States Navy. (*See* 5/28/19 Aliment Decl. (Dkt. # 96) ¶ 2, Ex. 1 ("9/26/18 Clayton Dep.") at 33:9-12; 5/28/19 Aliment Decl. ¶ 2, Ex. 5 ("Durrani Report") at 3; SAC (Dkt. # 1-1) § III.) Mr. Clayton's asbestos exposure occurred while he served on the *USS Badger* from February 1972 through March 1973. (9/26/18 Clayton Dep. at 33:9-12.) Mr. Clayton served as an interior communications ("IC") fireman. (*Id.* at 33:9-24; 5/28/19 Aliment Decl. ¶ 2, Ex. 2 ("5/28/18 Clayton Dep.") at 31:6-9.) In this position, Mr. Clayton worked "all throughout the ship," including performing "maintenance on the sound-powered phones," and working on the

---

a wrongful death and survivorship action. (*See id.*) Because the court has not yet ruled on this motion, the court continues to include Mr. Clayton as a Plaintiff.

[2] Syd Carpenter requests oral argument on its motion (*see* Syd MSJ at 1), but the court determines that oral argument would not be helpful to its disposition of the motion, *see* Local Rules W.D. Wash. LCR 7(b)(4). No party requests oral argument on Plaintiffs' motion. (*See* Pls. MSJ; Pls. Resp.) Accordingly, the court decides the motions without oral argument.

ship's "sump-pumping sensors and gauges" and "in the boiler room." (5/28/18 Clayton Dep. at 33:5-21; 42:23-43:8.) In addition, Mr. Clayton states that he worked on "asbestos insulated pipes" and that there were "quite a few piles of insulated pipe on the boat." (*Id.* at 33:5-21; 45:2-16; 9/26/18 Clayton Dep. at 76:12-78:12.)

The *USS Badger* also contained insulation pads, sometimes referred to as blankets, that were used to insulate unusually shaped items, such as pumps, valves, and sensors. (*See* 9/26/18 Clayton Dep. at 76:23-77:8; 5/28/19 Aliment Decl. ¶ 2, Ex. 3 ("1st Norton Dep.") at 45:5-46:3.) The ship's IC fireman would occasionally have to remove these pads. (1st Norton Dep. at 45:24-46:3.) Further, the ship's sensors were covered in significant amounts of insulation, which inhibited the sensor's performance. (*See id.* at 40:24-41:11 ("A lot of times, especially early on, it wasn't so much that the sensor was bad. It was just covered with so much insulation that it couldn't do its job.").) The ship's IC fireman would "cut that insulation off" to help the sensors work. (*Id.*)

As a low-ranking seaman, Mr. Clayton was also tasked with repairing insulation that came loose during the ship's operations. (5/28/18 Clayton Dep. at 33:5-21; 41:5-42:22.) When the insulation "vibrated loose" off a pipe, Mr. Clayton would "take it down, paint the pipe and then put [the insulation] back up and secure it." (*Id.*) The insulation also came loose in the form of dust and dirt, including when the *USS Badger*'s guns were in use. (*Id.*) Mr. Clayton recalls that, when the ship was not at port, he would always wake up with "dust all over the bunk and [his] face" and on his pillow. (*Id.*)

//

//

**B.    Syd Carpenter's Services**

Syd Carpenter was a California-based shipyard services contracting company that ceased doing business in or about 2002. (J. Carpenter Decl. (Dkt. # 88) ¶ 3.) "Among the services Syd Carpenter performed was installation of insulation on U.S. Navy ships." (*Id.* ¶ 4.) Syd Carpenter performed this service "pursuant to subcontracts with shipyards that, in turn, had contracts with the Navy to build and repair ships pursuant to Navy specifications." (*Id.*) According to James Carpenter, a former president of Syd Carpenter, the company "performed insulation installation services on the [*USS*] *Badger* in the early 1970s at the shipyard in San Pedro, California owned and run by Todd Shipyard." (*Id.* ¶¶ 2, 4.)

Syd Carpenter claims that it "does not have documents showing whether the insulation it installed on the [*USS*] *Badger* was purchased by Syd Carpenter, Todd Shipyard, the Navy, or some other entity." (*Id.* ¶ 5.)[3] Syd Carpenter admits that it "purchase[d] insulation" "for some of the installation services it performed at Todd Shipyard." (*Id.*) Syd Carpenter also admits that it "suppl[ied] materials" in connection with its work on Navy ships. (5/28/19 Aliment Decl. ¶ 2, Ex. 11 ("1st J. Carpenter Dep.") at 79:23-80:5.) However, Syd Carpenter claims that any insulation it purchased was "in compliance with Navy specifications and/or Todd Shipyard requirements, from insulation vendors qualified by the Navy and appearing on U.S. Navy Qualified Product

---

[3] Plaintiffs assert that they brought a spoliation claim against Syd Carpenter. (*See* Syd Resp. at 1-2; *but see generally* SAC (failing to mention "spoliation").) This alleged claim is not at issue in the present motions. (*See* Syd Reply at 4.)

Lists ('QPLs')." (J. Carpenter Decl. ¶ 5; *see also* 5/28/19 Aliment Decl. ¶ 2, Ex. 9 ("S. Carpenter Dep.") at 12:11-26 (explaining that the government would "specify the type of material we're to use").) Syd Carpenter asserts that any insulation it may have supplied in connection with its work on the *USS Badger* "was for use in the performance . . . of a services contract for the installation of insulation on that ship." (J. Carpenter Decl. ¶ 5.) Syd Carpenter also asserts that it "was never a manufacturer or distributor of any products, asbestos-containing or otherwise." (*Id.* ¶ 6.)

In addition to installing insulation on the *USS Badger*, Syd Carpenter performed "flooring and boiler refractory work." (5/28/19 Aliment Decl. ¶ 2, Ex. 12 ("Interrog. Resp.") at 7-8.) Mr. Carpenter recalls that Syd Carpenter installed "amosite asbestos pads," among other things, on the *USS Badger*. (*Id.*) Mr. Carpenter also testifies that, during the time Syd Carpenter worked on the *USS Badger*, Syd Carpenter "fabricated insulation pads" for installation on the ships. (1st J. Carpenter Dep. at 19:7-22:17.) According to Mr. Carpenter, to make these pads, "we take a piece of cloth; we sew it, turn it inside out, and then we stuff it with the interior stuff. We assemble it with the interior stuff." (Bernhardt Decl. (Dkt. # 101) ¶ 2, Ex. 1 ("2d J. Carpenter Dep.") at 157:15-158:8.) Syd Carpenter attached these pads with copper wire to "Ts and valves and uneven areas." (*Id*; 1st J. Carpenter Dep. at 19:7-22:17.)[4] The cloth that was used

---

[4] Plaintiffs repeatedly cite material that is not in the record. For example, Plaintiffs cite to page 58 of Mr. Carpenter's deposition transcript, which is found at exhibit 11 of Ruby K. Aliment's May 28, 2019, declaration. (*See* Syd Resp. at 6 n.26.) Plaintiffs, however, did not include this page in the exhibit. (*See generally* 1st J. Carpenter Dep.) At other times, Plaintiffs quote deposition text without providing any citation. (*See* Syd Resp. at 7 (failing to cite purported testimony about "the products' assembly").) Although the court reviews all of the

contained asbestos. (1st J. Carpenter Dep. at 19:7-22:17.) Syd Carpenter would store "[s]ome" of these pads at its warehouse at Todd Shipyard. (*Id.* at 28:1-29:4.)

**C. Procedural History**

Plaintiffs brought this action against numerous Defendants in King County Superior Court on April 10, 2018. (*See* Not. of Rem. (Dkt. # 1).) On May 23, 2018, Defendant Vigor Shipyards, Inc. ("Vigor") removed the case to federal court. (*See id.*) "In an effort to secure a trial date during Mr. Clayton's lifetime, Plaintiffs severed Vigor from the case and re-filed their remaining claims in state court." (Pls. MSJ at 4.) On September 28, 2018, Syd Carpenter removed the second case to federal court. *See William R. Clayton v. IMO Indus., Inc.*, No. C18-1437JLR (W.D. Wash.), Dkt. # 1. On November 9, 2018, the court consolidated the actions. (*See* 11/9/18 Order (Dkt. # 70).) Syd Carpenter is the only remaining active Defendant in this action. (Pls. MSJ at 5; *see* Dkt.) All other Defendants have either been terminated or are in the process of settlement. (*See* Dkt.)

Syd Carpenter moves the court for summary judgment on "all claims" against it except negligence and spoliation. (*See* Syd MSJ at 1; Syd Reply at 4.) In addition, Plaintiffs move for summary judgment on Syd Carpenter's government contractor defense. (*See* Pls. MSJ.)

The court addresses the motions in turn.

---

parties' citations, the court will not comb the record to account for citation errors and omissions. *Cf. Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

III.     ANALYSIS

A.     **Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of an issue of material fact in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party will bear the ultimate burden of persuasion at trial, it must establish a prima facie showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id*. at 1473. If the

moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because these are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 249-50. Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "Conclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003). Nor can a party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

**B.  Strict Liability**

As an initial matter, because Mr. Clayton's alleged exposure occurred before the enactment of the Washington Products Liability Act ("WPLA") in 1981, the court considers Plaintiffs' strict liability claim under the common law as set forth in Restatement (Second) of Torts § 402A. *See Hassebrock v. Air & Liquid Sys. Corp.*, No.

C14-1835RSM, 2015 WL 5883403, at *2 (W.D. Wash. Oct. 8, 2015); *Mavroudis v. Pittsburgh-Corning Corp.*, 935 P.2d 684, 690 (Wash. Ct. App. 1997); RCW 4.22.920 (explaining that the WPLA "shall apply to all claims arising on or after July 26, 1981"); (*see also* Syd MSJ at 4-5; Syd Resp. at 11 (stating that both Washington common law and federal maritime law have adopted the Restatement (Second) of Torts § 402A).)

Syd Carpenter moves for summary judgment on Plaintiffs' strict liability claim. (*See* Syd MSJ at 4-10.) Syd Carpenter argues that it is a subcontractor, not a "seller" or "manufacturer," and therefore it is not subject to strict liability. (*Id.*) In response, Plaintiffs assert that Syd Carpenter is in fact a manufacturer because it manufactured asbestos-containing products and supplied them for installation on the *USS Badger*. (Syd Resp. at 11.)

Pursuant to the Restatement:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Restatement (Second) of Torts § 402A. "The applicability of the strict liability doctrine depends upon, among other things, whether the defendant is a manufacturer or seller in the business of selling a defective product." *Scordino v. Hopeman Bros.*, 662 So. 2d 640, 643 (Miss. 1995); *Hassebrock*, 2015 WL 5883403, at *3 (finding "the reasoning in *Mack* [*v. Gen. Elec. Co.*, 896 F. Supp. 2d 333 (E.D. Pa. 2012)] and *Scordino* persuasive").

Section 402A defines a "seller" as "any person engaged in the business of selling products for use or consumption." Restatement (Second) of Torts § 402A cmt. f. The Restatement does not define "manufacturer." *See id.* But, based on Restatement (Second) of Torts § 395, courts have defined "manufacturer" in this context as "a person or company 'who regularly, and in the court of their principal business, create, assemble and/or prepare goods for sale to the consuming public.'" *Scordino*, 662 So. 2d at 645 (quoting *Olson v. Ulysses Irrigation Pipe Co., Inc.*, 649 F. Supp. 1511, 1516 (D. Kan. 1986)) (emphasis omitted). "In other words, a manufacturer produces goods as a principal part of its business *and* sells them either directly or for resale to the consuming public." *Id.*

Plaintiffs do not dispute that Syd Carpenter, as a subcontractor, was not a "seller" of asbestos-containing material. (*See* Syd Resp. at 11-13); *see also Scordino*, 662 So. 2d at 644 (discussing cases and explaining that "[o]ther jurisdictions which have addressed this issue have determined that contractors and subcontractors are not within the scope of the term 'seller' as it is used in Section 402A of the Restatement (Second) of Torts"). Instead, Plaintiffs contend that Syd Carpenter's fabrication of the insulation pads makes them a manufacturer that can be strictly liable. The court disagrees.

Whether Syd Carpenter is subject to strict liability for its work on the *USS Badger* depends on whether it manufactured the insulation pads "for sale to the consuming public." *Scordino*, 662 So.2d at 645. The undisputed evidence shows that it did not. The record shows that Syd Carpenter fabricated insulation pads out of third-party materials for immediate installation on the ship. (*See* 2d J. Carpenter Dep. at 157:15-158:8.)

Nothing in the record indicates that Syd Carpenter ever sold these pads or otherwise made them available to the consuming public. In fact, Mr. Carpenter attests that "Syd Carpenter was never a manufacturer or distributor of any products, asbestos-containing or otherwise." (J. Carpenter Decl. ¶ 6.) Further, the undisputed record shows that Syd Carpenter's work on the *USS Badger* was done pursuant to a services subcontract to install insulation. (*Id.* ¶ 4.) There is no indication that this contract involved the "sale" of these insulation pads. The record also shows that the insulation Syd Carpenter used was supplied by third-party "insulation vendors qualified by the Navy and appear on U.S. Navy [QPLs]." (*Id.* ¶ 5.)

In short, there is no dispute of material fact that Syd Carpenter was not a seller or a manufacturer. Therefore, the court GRANTS Syd Carpenter's motion for summary judgment on Plaintiffs' strict liability claim.[5]

**C.      Conspiracy, Breach of Warranty, and Miscellaneous Claims**

Syd Carpenter moves for summary judgment on Plaintiffs' conspiracy and breach of warranty claims. (Syd MSJ at 10-11.)[6] Syd Carpenter asserts that Plaintiffs have not

---

[5] The court recognizes that Plaintiffs may have a spoliation claim against Syd Carpenter and that, if Plaintiffs prevail on this claim, they could receive an adverse inference instruction on any destroyed evidence. *See Henderson v. Tyrrell*, 910 P.2d 522, 531 (Wash. Ct. App. 1996). An adverse inference instruction may be relevant to Plaintiffs' strict liability cause of action. The spoliation claim, however, is not presently before the court. (*See* Syd Reply at 4; *see also* Pls. MSJ (not moving for summary judgment on spoliation).) Therefore, the court GRANTS Syd Carpenter's motion for summary judgment on Plaintiffs' strict liability claim without prejudice to Plaintiffs' re-raising the strict liability claim if they later prevail on their spoliation cause of action. (*But see* Sched. Order (Dkt. # 49) at 1 (providing a July 2, 2019, dispositive motions deadline).)

[6] Syd Carpenter expressly moves for summary judgment on Plaintiffs' premises liability claim but fails to provide any argument on this claim. (*See* Syd MSJ at 1; *see generally id.*) The

shown, "by clear, cogent, and convincing evidence," that Syd Carpenter engaged in a conspiracy. (*Id.* (quoting *All Star Gas, Inc. of Wash. v. Bechard*, 998 P.2d 367, 372 (Wash. Ct. App. 2000).) Specifically, Syd Carpenter claims that Plaintiffs have not provided any evidence that it acted in concert with another person to accomplish an unlawful purpose or that it had an agreement to do so. (*Id.* at 11.) Further, Syd Carpenter argues that Plaintiffs have failed to produce evidence of any warranty that Syd Carpenter is alleged to have breached. (*Id.*)

Syd Carpenter has shown that Plaintiffs lack evidence of essential elements on these claims. *See Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1106. Plaintiffs, however, do not address Syd Carpenter's motion on these grounds, much less identify specific facts from which a fact finder could reasonably find in their favor. (*See* Syd Resp.); *see also Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252. The court therefore GRANTS Syd Carpenter's motion for summary judgment on Plaintiffs' claims for conspiracy and breach of warranty.

Syd Carpenter also moves for summary judgment on Plaintiffs' "miscellaneous causes of action." (Syd MSJ at 11.) Neither party identifies these miscellaneous causes of action and therefore the court is unable to rule without knowing what they are. (*See id.*; Syd Resp.) The parties should know, however, that the court will not entertain any cause of action that is not specified in the complaint and actively pursued during the

//

---

court therefore addresses the premises liability claim alongside Syd Carpenter's argument that relates to "miscellaneous causes of action." (*Id.* at 11); *see infra* § III.C.

course of litigation. The court therefore DENIES Syd Carpenter's motion on these causes of action.

**D.     Government Contractor Defense**

Plaintiffs move for summary judgment on Syd Carpenter's federal government contractor defense. (*See* Pls. MSJ.) This defense "protects government contractors from tort liability that arises as a result of the contractor's compliance with the specifications of a federal government contract." *Getz v. Boeing Co.*, 654 F.3d 852, 860 (9th Cir. 2011) (internal punctuation removed) (quoting *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1000 (9th Cir. 2008)). The Supreme Court established the framework of the government contractor defense in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988). To prevail on the government contractor defense in the failure-to-warn context, the contractor must establish three elements: "(1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; [and] (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government." *Getz*, 654 at 866 (quoting *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 1003-04 (7th Cir. 1996)); *see also Tate v. Boeing Helicopters*, 140 F.3d 654, 656-57 (6th Cir. 1998) (stating same elements). To satisfy the first element, "the contractor must demonstrate that the government 'approved reasonably precise specifications' thereby limiting the contractor's 'ability to comply with [its] duty to warn.'" *Getz*, 654 F.3d at 866-67 (quoting *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744, 749 (9th Cir. 1997)).

//

The Ninth Circuit has emphasized that the "focus of the analysis is on 'government discretion, rather than dictation.'" *Leite v. Crane Co.*, 868 F. Supp. 2d 1023, 1029 (D. Haw. 2012), *aff'd*, 749 F.3d 1117 (9th Cir. 2014) (quoting *Getz*, 654 F.3d at 866). Thus, although the "governmental approval (or disapproval) of particular warnings [must] 'conflict' with the contractor's 'duty to warn under state law,'" *see Getz*, F.3d at 867 (quoting *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 586 (9th Cir. 1996)), the defense is not limited "to cases in which the government specifically forbids warnings altogether or to instances where the government explicitly dictates the content of the warnings adopted," *Getz*, 654 F.3d at 867.

In the asbestos context, the defense applies even where the government does not dictate or forbid an asbestos warning. *Leite*, 868 F. Supp. 2d at 1041. In other words, "the necessary 'conflict' required by *Boyle* is created in the failure-to-warn context where the government exercises discretion in determining the warnings to provide, and does not require the government to make a decision regarding asbestos warnings in particular." *Id.* Thus, defendants present a viable defense where they can prove that the government "considered, reviewed, and determined which warnings to provide [such that] the government's exercise of discretion necessarily 'conflicts' with the Contractors' duty to warn under state law." *Getz*, 654 F.3d at 867; *Leite*, 868 F. Supp. 2d at 1041. Because the government contractor defense "is an affirmative defense[, the defendant] has the burden of establishing it." *Snell*, 107 F.3d at 746.

Plaintiffs argue that the three Navy specifications regarding insulation that are applicable to the *USS Badger* do not contain any language prohibiting asbestos warnings,

and thus do not conflict with Syd Carpenter's state law duty to warn about the dangers of asbestos. (Pls. MSJ at 9.) The three specifications are (1) MIL-I-2781 (pipe covering); (2) MIL-I-2819 (block insulation); and (3) MIL-C-2861 (insulating cement). (*Id.*; *see also* 7/2/19 Aliment Decl. (Dkt. # 118) ¶ 2, Exs. 8-10.) These specifications "incorporate a military standard for 'Marking for Shipment and Storage,' MIL-STD-129, that expressly *required* the use of warnings." (Pls. MSJ at 9; *see, e.g.*, 7/2/19 Aliment Decl. ¶ 2, Ex. 9 § 5.2 ("In addition to any special marking specified in the contract or order, shipping containers shall be marked in accordance with Standard MIL-STD-129."); 7/2/19 Aliment Decl. ¶ 2, Ex. 11 ("MIL-STD-129").) However, according to Plaintiffs, MIL-STD-129 concerned the packaging and labeling of products for shipment and storage, not installation, and therefore do not apply to Syd Carpenter's work. (Pls. MSJ at 9; MIL-STD-129.)

Plaintiffs further argue that MIL-STD-129 "required the seller or manufacturer" to affix warning labels to packages containing "hazardous chemicals." (Pls. MSJ at 9; MIL-STD-129 § 2.2.10.4.3.) Pursuant to MIL-STD-129, these warning labels should be "in accordance with the Manufacturing Chemists Association's Manual L-1, A Guide for Preparation of Warning Labels for Hazardous Chemicals [("Manual L-1")] or in accordance with appropriate Department of Defense instructions as published which shall take precedence." (MIL-STD-129 § 2.2.10.4.3.) Manual L-1 specifies the labels that "the seller" should affix to containers of hazardous materials. (7/2/19 Aliment Decl. ¶ 2, Ex. 12 ("Manual L-1") at 108.) Manual L-1 provides the following "suggested" or "typical label" for "Harmful Dusts": "CAUTION! HARMFUL DUST[.] Avoid repeated

breathing or skin contact. Wash thoroughly before eating or smoking. Keep away from feed or food products." (Manual L-1 at 108, 113-14.) Manual L-1 also recommended that the label for insulation include the following precautionary measure: "Use (only) with adequate ventilation." (*Id.* at 115.) In addition, the Navy issued SEANAV Instruction No. 6260, which "applies to the labeling of all hazardous materials" used at Naval facilities. (*See* 7/2/19 Aliment Decl. ¶ 2, Ex. 13 ("SEANAV").) By its terms, SEANAV Instruction No. 6260 "refers to labeling of the original container as well as any other container to which the material may subsequently be transferred," but does not govern "[t]he type of labels to be affixed by the manufacturer." (*Id.* at 119.) Labels affixed by the manufacturer "are governed by State and Federal laws and regulations. . ." and must "abide by [Manual L-1]." (*Id.*) SEANAV Instruction No. 6260 does not mention asbestos or thermal insulation. (*See id.*; *see also* Pls. MSJ at 11.)

Plaintiffs also provide testimony from Navy personnel who attest that MIL-STD-129 does not prohibit "a manufacturer or supplier of an asbestos-containing product from attaching a safety or warning label to the container of that product." (*See* 7/2/19 Aliment Decl. ¶ 2, Exs. 14-15.) Syd Carpenter's naval expert, Admiral David P. Sargent, also testified that he is "not aware of any military specification that prohibited" manufacturers, distributors, and contractors "from warning regarding asbestos hazards." (7/2/19 Aliment Decl. ¶ 2, Ex. 20 ("Sargent Dep.") at 53:5-17.)

In response, Syd Carpenter points out that MIL-I-2781—the military specification for thermal insulation pipe covering—requires "interior packages and shipping containers [to] be marked in accordance with Standard MIL-STD-129." (Pls. Resp. at 2-3; Babbit

Decl. (Dkt. # 126) ¶ 3, Ex. 1 ("MIL-I-2781") § 5.2.) Syd Carpenter further claims that MIL-STD-129, which the parties agree applies to thermal insulation products, "provides specific requirements for labeling of materials shipped to the U.S. Navy." (Pls. Resp. at 3.) Syd Carpenter points out that MIL-STD-129 prohibited any unauthorized markings: "1.4 Unauthorized markings. No markings shall be placed on any containers other than those specified in this standard or authorized by the cognizant activity concerned, or those required by regulation or statute." (Babbit Decl. ¶ 4, Ex. 2 ("MIL-STD-129B") § 1.4.) Further, MIL-STD-129 explains that its purpose "is to provide uniform marking of military supplies and equipment for shipment and storage" and "is mandatory." (*Id.* at ii, § 1.1.) Syd Carpenter also asserts that MIL-STD-129 is undoubtedly the appropriate mechanism for the government to require asbestos-related warnings, as evidenced by the 1978 amendments to the standard that include a specific labeling instruction for packages containing asbestos. (Babbit Decl. ¶ 5, Ex. 3 ("MIL-STD-129H") § 5.4.35.1.)

Viewing the evidence in the light most favorable to Syd Carpenter, the court concludes that Plaintiffs are entitled to summary judgment. In short, the military standards and specifications that the parties cite apply to sellers and manufacturers of asbestos products. These standards specify the warning labels that must be affixed on the outside of shipment or storage containers. (*See, e.g.*, 7/2/19 Aliment Decl. ¶ 2, Ex. 9 § 5.2; MIL-STD-129.) But, as the court already determined—and as Syd Carpenter argued in relation to its summary judgment motion—Syd Carpenter is not a seller or manufacturer. *See supra* § III.B. Rather, Syd Carpenter is an insulation installer. The cited military standards, therefore, do not apply to Syd Carpenter's duty to warn.

In comparison, the court in *Leite* considered numerous military standards, including MIL-STD-129, Manual L-1, and SEANAV Instruction No. 6260, to determine if the defendants stated a colorable government contractor defense. *See* 868 F. Supp. 2d at 1031-34, 1037-38.[7] *Leite* also involved many of the same experts that are at issue in this case. *See id.* (citing testimony from Admiral David P. Sargent and Adam Martin). Viewing the evidence in the light most favorable to the defendants, the court concluded that the defendants had stated a colorable government contractor defense. *Leite*, however, involved defendants that "manufactured, sold and/or supplied various products containing asbestos to the United States Navy." 868 F. Supp. 2d at 1025. Syd Carpenter, by its own admission, did not perform that work. Moreover, nothing in *Leite* suggests that the military standards and instructions that are in front of the court apply to Syd Carpenter's installation and removal work. *See generally* 868 F. Supp. 2d 1023; (*see also* Pls. Reply at 4 ("None of the [standards] touch on Syd Carpenter's *installation and removal* of asbestos-containing insulation in the early 1970s.").)

Further, Syd Carpenter has not provided the contract for the work it performed on the *USS Badger*. (*See* Dkt.; J. Carpenter Decl. ¶ 5 (explaining that Syd Carpenter "does not have documents" regarding its relevant contract).) Thus, the court is unable to determine if Syd Carpenter acted in compliance with other specifications that may be contained in that contract. *See Getz*, 654 F.3d at 860.

---

[7] The court in *Leite* cited "SECNAV 5106.8," instead of SEANAV Instruction No. 6260. *See* 868 F. Supp. 2d 1037. Based on the quoted text in *Leite*, as well as the markings on the exhibit in this case, which cross out "6260" and replace it with "5160.8," these appear to be the same document. (*See* SEANAV at 119-20.)

In sum, viewing the evidence in the light most favorable to Syd Carpenter, the government did not "exercise[] its discretion and approve[] certain warnings" that relate to and limit Syd Carpenter's ability to comply with its duty to warn. *Getz*, 654 F.3d at 856. Syd Carpenter has therefore failed to show that there is a genuine dispute of material fact regarding the first element of the *Boyle* government contractor defense.

However, even if the court were to reach the second *Boyle* element—"the contractor provided the warnings required by the government," *id.*—Syd Carpenter fails there, as well. Mr. Carpenter admits that the Navy provided Syd Carpenter with signs to display during its installation work that warned of "[d]angerous asbestos." (*See* 7/26/19 Aliment Decl. (Dkt. # 136) ¶ 2, Ex. 1 ("3d J. Carpenter Dep.") at 30:9-31:6.) But Mr. Carpenter does not recall if Syd Carpenter displayed these signs. (*Id.*) Steve Norton, Mr. Clayton's second-class officer, testified, however, that he never saw a warning sign posted by insulation installers. (7/26/19 Aliment Decl. ¶ 2, Ex. 2 ("2d Norton Dep.") at 65:24-66:1.) Thus, Syd Carpenter has failed to present a genuine dispute of material fact that it "provided the warnings required by the government." *Getz*, 654 F.3d at 856.

In sum, the court GRANTS Plaintiffs' motion for summary judgment on Syd Carpenter's government contractor defense.

//

//

//

//

//

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Syd Carpenter's motion for partial summary judgment (Dkt. # 86) and GRANTS Plaintiffs' motion for partial summary judgment (Dkt. # 117).

Dated this 9th day of August, 2019.

JAMES L. ROBART
United States District Judge