UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JILL DIANE CLAYTON,<br><br>                    Plaintiff,<br>     v.<br><br>AIR & LIQUID SYSTEMS CORPORATION,<br><br>                    Defendant. | CASE NO. C18-0748JLR<br><br>ORDER DENYING MOTION TO EXCLUDE EXPERT TESTIMONY |

## I. INTRODUCTION

Before the court is Plaintiff Jill Diane Clayton's[1] motion to strike certain expert opinions of Kyle Dotson, Defendant Syd Carpenter Marine Contractor Inc.'s ("Syd Carpenter") expert witness.[2] (*See* MTE (Dkt. # 115).) Syd Carpenter opposes Plaintiff's

---

[1] Ms. Clayton is the surviving spouse and the executor of the estate of William Richard Clayton, deceased. (Am. Compl. (Dkt. # 146) ¶ 1.)

[2] Plaintiff's motion initially sought to exclude opinions offered by both Kyle Dotson and Howard Spielman, Defendant Vigor Shipyards, Inc.'s ("Vigor") expert witness. (*See id.* at 1-2.)

motion. (*See* Resp. (Dkt. # 120)).) The court has considered the motion, Syd Carpenter's response, all submissions filed in support of and in opposition to the motion, the relevant portions of the record, and the applicable law. Being fully advised,[3] the court DENIES the motion.

## II. BACKGROUND

This case involves claims related to asbestos exposures that Ms. Clayton alleges the decedent, Mr. Clayton, experienced while serving aboard the *USS Badger* ("the *Badger*") in the 1970's. (FAC (Dkt. # 146) § III.) Plaintiff asserts that Mr. Clayton was exposed to asbestos on the *Badger* in six ways: (1) through direct work on insulated communications systems; (2) as a bystander to other tradespersons' work on insulated equipment; (3) through direct maintenance and repair of thermal system insulation in his immediate work area; (4) as a bystander to Syd Carpenter's thermal insulation rip-out work at Todd Shipyard; (5) as a bystander while the ship was underway, which disturbed insulation dust and shook it loose; and (6) as a bystander while learning to maintain

---

However, on July 5, 2019, the parties notified the court that Vigor had settled (Notice (Dkt. # 119)), and on February 20, 2020, the court dismissed Plaintiff's claims against Vigor with prejudice (2/20/20 Order (Dkt. # 160)). Accordingly, the court DENIES as MOOT the portion of Plaintiff's motion seeking to exclude portions of Mr. Spielman's expert witness testimony.

[3] Neither party requests oral argument or a formal *Daubert* hearing. (*See generally* MTE; Resp.); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1991). The parties have fully briefed the issues (*see* MTE; Resp.; Reply (Dkt. # 122)) and submitted evidentiary materials in support of their respective positions (*see* 1st Aliment Decl. (Dkt. # 118); Babbitt Decl. (Dkt. # 121); 2d Aliment Decl. (Dkt. # 123)). The court, therefore, does not consider oral argument or an evidentiary hearing to be necessary to its disposition of Plaintiff's motion. *See* Local Rules W.D. Wash. LCR 7(b)(4) ("Unless ordered by the court, all motions will be decided by the court without oral argument."); (explaining that a district court is not required to hold a formal *Daubert* hearing "under Supreme Court precedent or [the Ninth Circuit's] own case law").

various systems aboard the ship. (MTE at 2-3 (citing 1st Aliment Decl. ¶ 2, Exs. 3 ("8/26/18 Clayton Dep."), 4 ("Norton Dep.")).) At the time that the case was filed, Mr. Clayton also testified that he was exposed to asbestos through his father, who was a career naval officer. (1st Aliment Decl. ¶ 2, Ex. 2 ("5/25/18 Clayton Dep.") at 23:23-24:16.) However, no party located a living witness who served with Mr. Clayton's father in the Navy or military records to explain how Mr. Clayton's father would have been exposed to asbestos. (*See* MTE at 5.)

Syd Carpenter relies on expert testimony from Mr. Dotson, an industrial hygienist, to calculate Mr. Clayton's lifetime asbestos exposure. (*See generally* 1st Aliment Decl. ¶ 2, Ex. 5 ("Dotson Rpt.").) Syd Carpenter relies on Mr. Dotson's opinions to support its positions that Mr. Clayton's exposure aboard the *Badger* was (1) below the Occupational Safety and Health Administration's ("OSHA") then-existing permissible exposure limit; and (2) *de minimus* or insignificant. (*See generally id.*) Mr. Dotson opines that "the worst-case hypothetical exposure for Mr. Clayton associated with thermal insulation aboard the . . . *Badger* allegedly associated with Syd Carpenter, if any, would have been less than any asbestos workplace standard in effect at the time." (*Id.* at 54 (Opinion 1).) He also opines that "Mr. Clayton would have had a certain amount of asbestos exposure simply from living in the natural ambient environment," and that "[s]uch exposure is not associated with asbestos-related disease." (*Id.* (Opinion 2).) Finally, he opines that Mr. Clayton's "worst-case hypothetical exposure" from asbestos associated with Syd Carpenter, if any, "was less than the cumulative exposure that anyone his age might expect to have from living in the ambient environment in major [U.S.] cities" and,

"[s]ince there is no measurable risk associated with exposure to the ambient environmental background, there can be no measurable risk associated with this exposure, if any." (*Id.* (Opinion 3).)

To arrive at his opinions, Mr. Carpenter engages in a "retrospective dose assessment" to create a range of hypotheticals, including a "worst-case hypothetical," intended to "define a level at which there is essentially no way that the exposure of interest would ever exceed." (*Id.* ¶ 2, Ex. 9 at 811:4-7.) To convert this range to a cumulative or lifetime exposure, Mr. Dotson divides what he determines to be the length of exposure by the average work year.[4] (*See* MTE at 9.) After establishing what Mr. Dotson considers to be Mr. Clayton's "cumulative exposure" to asbestos related to Syd Carpenter, Mr. Dotson then compares Mr. Clayton's "cumulative exposure" to a threshold exposure of "what anyone [Mr. Clayton's] age might expect to have from living in the natural ambient environment of the United States," below which Mr. Dotson opines "there is no measurable risk associated with exposure." (*See* Dotson Rpt. at 53-54.) Because Mr. Dotson concludes that (1) Mr. Clayton's "worst-case hypothetical exposure" to asbestos associated with Syd Carpenter is "less that the cumulative exposure that anyone [Mr. Clayton's] age might expect to have from living in the ambient environment in major [U.S.] cities," and (2) "there is no measurable risk associated with exposure to the ambient environmental background," he also concludes Mr. Clayton

//

---

[4] For example, Mr. Dotson would divide an exposure lasting 20 minutes by 120,000 minutes or an exposure lasting one hour by 2,000 hours. (*See* MTE at 9.)

suffered no measurable risk due to his exposures to asbestos associated with Syd Carpenter. (*Id.*)

Plaintiff argues that Mr. Dotson's work is scientifically unreliable and lacks sufficient factual foundation and that his opinions should be excluded on that basis. (*See* MTE at 10-12, 15-18.) The court now addresses Plaintiff's motion.

### III.     ANALYSIS

**A.     Standards**

"Before admitting expert testimony into evidence, the district court must perform a 'gatekeeping role' of ensuring that the testimony is both 'relevant' and 'reliable' under Federal Rule of Evidence 702."[5] *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (citing *Daubert*, 509 U.S. at 597). "Relevancy simply requires that 'the evidence logically advance a material aspect of the party's case.'" *Id.* (citing *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (citation and internal alterations omitted)). Reliability "requires that the expert's testimony have 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* (quoting *Kumho*

//

---

[5] Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
    (b) the testimony is based on sufficient facts or data;
    (c) the testimony is the product of reliable principles and methods; and
    (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

*Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).  The test for reliability "'is not the correctness of the expert's conclusions but the soundness of his methodology,' and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010)).  The reliability analysis is "a malleable one tied to the facts of each case," and "district courts are vested with 'broad latitude' to 'decide how to test an expert's reliability' and 'whether or not an expert's relevant testimony is reliable.'" *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922-23 (9th Cir. 2017) (quoting *Kumho Tire*, 526 U.S. at 152-53).  Although *Daubert*, 509 U.S. at 592-94, identifies several factors that may be used for evaluating the reliability of an expert—whether the scientific theory or technique has been tested, peer reviewed, identified as having a particular rate of error, and generally accepted in the scientific community—district courts are not required to consider all (or even any) of these factors, nor are they required to hold a "*Daubert* hearing."  *Barabin*, 740 F.3d at 463-64.

**B.      Reliability**

Ms. Clayton argues that attempts to reconstruct an individual's lifetime dose of asbestos, like the one found in Mr. Dotson's report, "have been widely criticized as unreliable."[6]  (MTE at 15.)  Although Ms. Clayton cites criticisms of the analytical

---

[6] Plaintiff challenges only the reliability and not the relevancy of Mr. Dotson's expert testimony.  (*See* Reply at 2-3 ("[Ms. Clayton] expressly acknowledges that *accurate* dose

approach Mr. Dotson uses (*see id.* at 15-16 nn. 53-57), the court cannot conclude that Mr. Dotson's methodology lacks "'a reliable basis in the knowledge and experience of the relevant discipline,'" *see Ruvalcaba-Garcia*, 923 F.3d at 1188 (quoting *Kumho Tire Co.*, 526 U.S. at 149). Indeed, Mr. Dotson is a certified industrial hygienist with over 30 years of experience (*see* Dotson Rpt. at 1), and as indicated in his report, he relied upon, reviewed, and cited over 200 industrial documents and studies in arriving at his opinion concerning Mr. Clayton's potential exposures to products associated with Syd Carpenter (*see generally id.*). Further, Mr. Dotson cites other credible scientific sources to confirm that the industrial hygiene profession has recognized, since the 1970's, that "standard exposure assessment methodologies" can be used to estimate an individual's cumulative asbestos exposure. (*Id.* at 7 nn.41-42.)

Moreover, Ms. Clayton acknowledges that she does not seek to exclude all dose reconstruction testimony (*see* Reply at 2); and indeed, Plaintiff's expert, Timur Durrani, intends to offer his own opinions concerning the level of asbestos exposure Mr. Clayton sustained while working aboard the *Badger* (*see* Babbitt Decl. ¶ 7, Ex. 5 ("Durrani Dep.") at 137:7-24). Specifically, Dr. Durrani testified in his deposition that generalized studies on dose quantification for activities Mr. Clayton allegedly

//

---

reconstruction may be helpful to the jury in an asbestos case.").) The court concludes that because mesothelioma is caused by exposure to respirable asbestos, Mr. Dotson's testimony concerning Mr. Clayton's exposure to asbestos fibers while he worked aboard the *Badger* is relevant and "will help the trier of fact to understand the evidence or determine a fact in issue." *See* Fed. R. Evid. 702(a); *see also Ruvalcaba-Garcia*, 923 F.3d at 1188 (stating that "[r]elevancy simply requires that the evidence logically advance a material aspect of the party's case") (internal citation and quotation marks omitted).

performed helped him derive his exposure opinions. (*See id.* at 137:7-24.) Nevertheless, Dr. Durrani testified that "dose reconstruction is a difficult model to interpret and rely on" (*id.* at 127:14-25), that he does not typically perform this type of calculation (*see id.* at 130:13-19), and that he would only be comfortable relying on a lifetime dose calculation after a "fair amount" of "work with a colleague who would know what they are doing" (*id.* at 130:13-22). Although Dr. Durrani criticizes Mr. Dotson's methodology as "difficult" (*id.* at 127:14-25), he does not testify that Mr. Dotson's method is scientifically unreliable (*see generally id.*).

Ms. Clayton does not dispute that over 25 courts have qualified Mr. Dotson as an expert witness when employing the same method Ms. Clayton challenges here. (*See* Resp. at 2; Dotson Rpt. at 78-94;[7] *see generally* MTE; Reply.) Although Mr. Dotson's qualification as an expert witness in other trials is not dispositive of the present motion, it provides additional support for the court's conclusion that Mr. Dotson's methods meet the Rule 702 threshold of reliability. *See* Fed. R. Evid. 702. Plaintiff's expert witness, Dr. Durrani, chose a different method by which to calculate Mr. Clayton's exposures (*see* Durrani Dep. at 137:7-24), and Dr. Durrani is permitted to offer his critique of Mr. Dotson's method at trial and to testify why his method is superior. These are issues, however, for the jury to weigh. *See Pyramid Techs., Inc.*, 752 F.3d at 814 (stating that "when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony"). In sum, the court

---

[7] The page numbers in this citation are to the electronic numbers generated by the court's electronic filing system.

concludes that Mr. Dotson's opinions meets the Rule 702 threshold level of reliability for admission at trial.

Plaintiff also asserts that Mr. Dotson's opinions are not based on the facts in this case. (*See* MTE at 17-18.) Plaintiff argues that Mr. Dotson "fails to account for all of Mr. Clayton's work assignments, how long that work took place, and the type of asbestos involved in that work." (*Id.* at 18.) Although the parties may dispute the factual record and how well Mr. Dotson applies that record to his analysis, Mr. Dotson summarizes Mr. Clayton's deposition testimony in detail in his report, including Mr. Clayton's testimony concerning thermal insulation work, insulation loosening from ship vibrations, and the frequency of his alleged exposures. (*See* Dotson Rpt. at 9-15.) Ms. Clayton may disagree with Mr. Dotson's characterization of Mr. Clayton's deposition testimony or argue that Mr. Clayton overemphasized certain passages or failed to adequately consider others, but based on Mr. Dotson's lengthy recitation of Mr. Clayton's testimony and Mr. Dotson's review of myriad other evidentiary materials in this case (*see id.* at 1-2), the court concludes that Mr. Dotson's opinions are "based on sufficient facts or data" to warrant admission of his opinion testimony at trial. *See* Fed. R. Evid. 702(b).

Plaintiff further argues that Mr. Dotson "miscalculates the exposure associated with given work assignments and assumes dust control measures were in place [on the *Badger*] without citation to the evidence in this case." (MTE at 18.) Again, although the parties may disagree concerning the appropriate exposure value that should be used, Mr. Dotson provides a justification for the value he uses that is grounded in Mr. Clayton's deposition testimony. (*See* Resp. at 9 (citing Dotson Rpt. at 46, 50).) Further, Mr.

Dotson's report and deposition testimony provide rational bases for his opinion that some asbestos controls were in place aboard the *Badger* and why he did not analyze fiber type in this case. He grounds his opinion that some industrial hygiene controls were in place on the *Badger* during the 1972-73 timeframe "upon the regulatory history of asbestos in the [United States] including the [U.S.] Navy as characterized by the documentation of [U.S.] Navy procedures by the Puget Sound Naval Shipyard and other [U.S.] Navy correspondence and documents." (Dotson Rpt. at 49.) Further, during his deposition, Mr. Dotson explained that he did not analyze fiber size in this case because "to the extent that [Mr. Clayton's] exposure is insignificant on a worst-case hypothetical basis, [fiber size] would not change [his] conclusion." (*See* Babbit Decl. ¶ 8, Ex. 6 ("Dotson Dep.") at 16:3-17:20.)

      The parties' expert witnesses disagree about Mr. Clayton's asbestos exposure in this case. These disagreements, however, are typical in a case such as this and do not provide a basis for excluding Mr. Dotson's expert opinion. Instead, the disagreements highlighted in Ms. Clayton's motion represent "fodder for cross-examination" as Ms. Clayton implicitly acknowledges (*see* MTE at 18)—not a basis for exclusion under Rule 702 or *Daubert*. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592-94.

//

//

//

//

//

## IV. CONCLUSION

Based on the foregoing analysis, the court DENIES Plaintiff's motion to exclude Mr. Dotson's expert dose reconstruction opinions (Dkt. # 115).

Dated this 13th day of February, 2020.

JAMES L. ROBART
United States District Judge